PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

KENSINGTON VOLUNTEER FIRE
DEPARTMENT, INC; AUGUSTINE M.
KELLEY; SHAWN ST. CLAIRE;
BETHESDA FIRE DEPARTMENT, INC.;
PAULA MACKEL; CABIN JOHN PARK
VOLUNTEER FIRE DEPARTMENT, INC;
HYATTSTOWN VOLUNTEER FIRE
DEPARTMENT, INC; JANETH MORA,

        *Plaintiffs-Appellants,*

        and

STEVEN C. KURTZ; DEBORAH ROKES;
STEPHANIE AYTON,

        *Plaintiffs,*

        v.

MONTGOMERY COUNTY, MARYLAND;
ISIAH LEGGETT, COUNTY EXECUTIVE;
RICHARD BOWERS, Fire Chief;
JOSEPH ADLER; JOSEPH BEACH,

        *Defendants-Appellees,*

MONTGOMERY COUNTY COUNCIL,
The,

        *Defendant.*

No. 11-1659

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
J. Frederick Motz, Senior District Judge.
(8:11-cv-00273-JFM)

Argued: March 22, 2012

Decided: June 27, 2012

Before DUNCAN, AGEE, and DIAZ, Circuit Judges.

---

Affirmed by published opinion. Judge Diaz wrote the opinion, in which Judge Duncan and Judge Agee joined.

---

**COUNSEL**

**ARGUED:** Brett Alan Pisciotta, KING & ATTRIDGE, Rockville, Maryland, for Appellants. Edward Barry Lattner, COUNTY ATTORNEY'S OFFICE, Rockville, Maryland, for Appellees. **ON BRIEF:** John A. King, KING & ATTRIDGE, Rockville, Maryland, for Appellants. Marc P. Hansen, County Attorney, Patricia P. Via, Chief, Division of Litigation, COUNTY ATTORNEY'S OFFICE, Rockville, Maryland, for Appellees.

---

**OPINION**

DIAZ, Circuit Judge:

A group of local volunteer fire and rescue departments ("LFRDs") and several of their former administrative employees (collectively, "Plaintiffs") brought suit against Montgomery County, Maryland, the County Council, and certain county officials (collectively, "Defendants") contending that Defendants eliminated part of Plaintiffs' funding in retaliation for Plaintiffs' opposition to legislation supported by Defendants.

The district court dismissed Plaintiffs' complaint, declining to inquire into Defendants' alleged illicit motive behind an otherwise facially valid budgetary enactment, finding that certain individual defendants were protected by legislative immunity, and concluding that because the individual Plaintiffs were not County employees, they could not bring an abusive discharge claim under state law. We affirm.

## I.

## A.

The Montgomery County Fire and Rescue Service ("MCFRS") is a "combined and integrated" operation consisting of both County employees and several LFRDs that collectively provide fire, rescue, and emergency medical services. J.A. 190. Although each LFRD is an independent corporation under Maryland law, the County traditionally funds administrative support positions at the LFRDs. Despite this unique funding relationship, the Montgomery County Code ("Code") provides that these LFRD administrative personnel are not employees of the County. *Id.* 553 ("Employees of local fire and rescue departments who are paid with tax funds are not County employees.") (quoting Code § 21-16(a)); *see also id.* 554 ("Nothing in this Chapter means that employees of the local fire and rescue departments are County employees, either on a de jure or de facto basis.") (quoting Code § 21–16(c)).

In May 2010, the County Council passed Budget Resolution 16–373 for fiscal year 2011 ("FY11"). The original budget included $1.58 million for LFRD personnel, including twenty administrative support positions. The County later determined, however, that it needed to reduce its projected budget for FY11. Specifically, the County sought to offset lost revenue from the anticipated defeat of Bill 13–10—the proposed "ambulance fee" legislation—that was projected to generate $14.1 million annually and was included in the origi-

nal FY11 budget.[1] Bill 13–10 encountered fierce opposition, particularly from the LFRDs. As Plaintiffs describe, the LFRDs "vehemently, publicly and forcefully advocated against the ambulance fee through the press and through the distribution of political literature." Appellants' Br. 9. Voters ultimately rejected the bill in a referendum placed on the November 2010 ballot.

Prior to the referendum vote—but after determining that the ambulance fee legislation would likely fail—County Executive Isiah Leggett sent a budget savings plan to the County Council on October 5, 2010 "to address the potential loss of revenue" from Bill 13-10's defeat. J.A. 140. The plan called for $14.3 million in spending cuts and the elimination of 133 publicly funded positions, affecting the MCFRS and a host of other agencies. Relevant to this appeal, the plan recommended in part that the County "discontinue funding 20 LFRD civilian employees," at a savings of $592,000, offsetting the loss of personnel by creating five new administrative positions with the County, *id.* 143. The plan did not cut funding for non-volunteer administrative positions within MCFRS.

As a result of the general economic slump, Leggett submitted another savings plan for FY11 in December 2010, proposing additional reductions to close the projected shortfall for fiscal year 2012. The revised plan called for deeper cuts from a range of agencies, but no additional reductions to the LFRDs' budget.

At a December 14, 2010 County Council session to discuss the revised plan, Montgomery County Fire Chief Richard Bowers spoke in support of the proposal and, according to Plaintiffs, "promoted the impression that the Council's choices [for funding priorities] lay between 'boots on the ground' and administrative personnel that readily could be

---

[1]As its name implies, the ambulance fee legislation would have imposed a fee for ambulance service.

supplanted by MCFRS operational personnel." *Id.* 18. Plaintiffs also allege that one councilmember appeared to blame the LFRDs for the ambulance fee's defeat and stated that he thought LFRD budgets should be cut even further. Another councilmember assailed the proposal for imposing a "disproportionate hit on the volunteers." *Id.* 19 (internal quotations omitted). Ultimately, in a 5-4 vote, the County Council passed the revised budget, authorizing reductions of $32,249,170 from the FY11 budget. Of this figure, $592,000—or about 1.8 percent—of the savings stemmed from defunding the twenty LFRD administrative positions.

Days later, Bowers sent a letter to each LFRD stating that as of the end of the year, "LFRD employees will no longer be paid by Montgomery County," and adding that each LFRD "must immediately determine if the LFRD will retain your employee or effect a Reduction in Force (RIF)." *Id.* 63. Thereafter, the LFRDs notified the affected employees that they would be conducting a RIF and terminating the administrative positions.

## B.

Plaintiffs filed a five-count complaint in state court alleging that Defendants' decision to eliminate funding for the LFRD administrative positions was in retaliation for Plaintiffs' opposition to the ambulance fee legislation.[2] Count 1 sought a declaration that Defendants' actions were unconstitutional and illegal and an injunction barring Defendants from defunding the LFRD positions, now or in the future. Count 2 sought relief under 42 U.S.C. § 1983, asserting that Defendants, acting under color of state law, violated the First Amendment to the U.S. Constitution by retaliating against Plaintiffs for their opposition to the ambulance fee legislation. Count 3 alleged

---

[2]In a subsequent amended complaint, Plaintiffs named additional plaintiffs and dismissed the County Council as a defendant, but did not revise their substantive allegations.

abusive discharge under Maryland common law. Count 4 alleged violations of the First Amendment and Article 40 of the Maryland Declaration of Rights. Count 5 sought a writ of mandamus compelling Defendants to comply with the RIF requirements in the Montgomery County Personnel Regulations.

After removing the case to federal court, Defendants moved to dismiss and/or for summary judgment. Finding that it could resolve the motion without considering matters outside of the pleadings, the district court treated Defendants' filing as a Rule 12(b)(6) motion to dismiss, and granted it. The district court found that (1) Plaintiffs could not challenge the alleged illicit legislative motive behind the County's facially valid budget; (2) Defendants Leggett and Bowers were shielded by legislative immunity because they were acting in a functionally legislative role on matters related to the County budget; and (3) Plaintiffs could not bring an abusive discharge claim under Maryland law because the individual Plaintiffs were not County employees, "dual or otherwise." *Id.* 773. Plaintiffs timely appealed.

## II.

We review de novo the district court's grant of Defendants' motion to dismiss. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). In ruling on a 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences in favor of the plaintiff." *Id.* (internal quotations omitted). In so doing, a court may consider documents attached to the complaint or the motion to dismiss "so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). To survive a 12(b)(6) motion to dismiss, Plaintiffs' complaint "must contain sufficient facts to state a claim that is 'plausible on its face.' " *Kolon*, 637 F.3d at 440 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

III.

A.

Plaintiffs first argue that the district court erred in refusing to inquire into the allegedly unconstitutional motive behind the County's budget. The district court's decision relied on *United States v. O'Brien*, 391 U.S. 367, 383 (1968), in which the Supreme Court declined to "strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."

*O'Brien* considered a First Amendment challenge to a federal statute that penalized the destruction of draft cards. Noting that the law did not facially abridge speech, the Court rejected an argument that the law was nonetheless unconstitutional because its purpose was to suppress free speech. The Court warned that it was a "hazardous matter" to inquire into legislative motives because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." *Id.* at 383-84. Accordingly, the Court "decline[d] to void [legislation] essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it." *Id.* at 384.

We hold that the district court properly dismissed Plaintiffs' First Amendment, Article 40, and § 1983 claims.[3] As Plaintiffs concede, the budget is facially valid. And in alleging that Defendants retaliated against them by eliminating

---

[3]Article 40 is "co-extensive" with the First Amendment, and is construed *in pari materia* with it. *Newell v. Runnels*, 967 A.2d 729, 743 n.11 (Md. 2009). Plaintiffs' § 1983 claim alleged that because Defendants were acting under color of state law, the First Amendment violation led to § 1983 liability.

funding for the LFRD administrative positions, Plaintiffs challenge Defendants' *legislative* action. Plaintiffs, however, rely for support on cases in which the alleged retaliation was accomplished via *executive* action. *See Gronowski v. Spencer*, 424 F.3d 285, 289 (2d Cir. 2005) (claim that the mayor—who had "ultimate authority over municipal employment decisions"—laid off several employees); *Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003) (claim that plaintiffs were retaliated against by, among other things, being transferred to new duties, reprimanded, investigated, and suspended); *Cooper v. Johnson*, 590 F.2d 559, 560 (4th Cir. 1979) (claim by former deputy sheriff that the sheriff fired him based on his speech on a topic of public concern).

Moreover, while the budget eliminated some of Plaintiffs' funding, its effect was not felt by Plaintiffs alone. Specifically, the initial revised budget savings plan called for $14.3 million in across-the-board reductions and the elimination of 133 publicly funded positions from a number of county agencies. The County's final budget, incorporating additional cuts, resulted in over $32 million in savings. Of that total reduction, only $592,000—or about 1.8 percent of the total cuts—targeted the twenty LFRD administrative positions. And, while the budget identifies the LFRD positions by name, it does so as part of a line-item budget explanation that identifies other specific cuts as well. *See* J.A. 143-47 (listing, for example, nine school resource officer positions to be abolished, and four sports academies and an interim library to be closed).

In trying economic times, and in response to the loss of $14.1 million in projected revenue following the defeat of the ambulance fee legislation, the County passed a budget that called for difficult cuts felt by many. As the district court concluded "there is no doubt that Defendants had the authority to pass the budget savings plan, and it appears to be a thoroughly ordinary cost savings measure." *Kensington Volunteer Fire Dept., Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 440

(D. Md. 2011). Confronted with such a facially constitutional budgetary enactment, *O'Brien* instructs that we not strike it down "on the basis of an alleged illicit legislative motive," 391 U.S. at 383.

## B.

Plaintiffs, however, contend that *O'Brien* does not apply in the context of a retaliatory discharge claim. As they see it, the claim itself—requiring Plaintiffs to show that (1) they engaged in protected activity, and (2) the protected activity was a substantial or motivating factor in the adverse employment action—contemplates analysis of Defendants' motive. *See Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996) (outlining test for retaliatory discharge claim). Plaintiffs contend that we recognized as much in *Berkley v. Common Council*, 63 F.3d 295 (4th Cir. 1995) (en banc) and *Burtnick v. McLean*, 76 F.3d 611 (4th Cir. 1996). These cases, however, do not address the precise question before us.

In *Berkley*, a group of city employees alleged that "in enacting the annual budget . . . , [the] Council denied appellants a salary increase [because] appellants had actively supported a candidate in the prior mayoral election other than the one favored by a majority of the . . . Council, in violation of the First Amendment." 63 F.3d at 302. The district court dismissed the complaint, as it "would necessarily require an examination of the Council's motive for its vote. . . . [which] runs squarely afoul of the doctrine of legislative immunity." *Id.* (internal quotations omitted). We reversed, concluding that well-established Supreme Court precedent foreclosed "the possibility of legislative immunity for municipalities." *Id.*

*Burtnick* considered a § 1983 challenge brought by a former employee who alleged that he was improperly terminated when the city abolished his job. There, the plaintiff's superior was a voting member of the board that, as part of its budget recommendation, eliminated funding for the plaintiff's job,

creating another position for which the plaintiff was not considered. The district court granted summary judgment to the city, finding that the challenged decision was legislative and thus covered by legislative immunity. Relying on *Berkley*, we reversed. 76 F.3d at 613.

*Berkley* and *Burtnick* hold "that a municipality is not *immune* from liability under section 1983 for the enactments and actions of the local legislative body." *Berkley*, 63 F.3d at 296 (emphasis added); *see also Burtnick*, 76 F.3d at 612-13 (citing *Berkley* and reversing district court's grant of summary judgment based on legislative immunity). But "whether a [municipality] is immune from suit is quite a different question from whether, after the suit is filed, a court may rely on alleged improper legislative motives to strike down an otherwise valid statute." *Kensington*, 788 F. Supp. 2d at 439-40. On this point, neither *Berkley* nor *Burtnick* undermines *O'Brien*.

Moreover, although *Berkley* and *Burtnick* addressed budgetary enactments, they did so in the context of claims brought by employees who worked directly for the municipalities alleged to have acted improperly. *See* Brief of Appellant at *2, *Berkley v. Common Council*, 63 F.3d 295, No. 94-1121 (4th Cir. Mar. 11, 1994), 1994 WL 16049631 (noting that "[a]ll of the plaintiffs in this action are employees of the City of Charleston," including the city director of human rights, the assistant personnel director, and the deputy director of parks and recreation); *Burtnick*, 76 F.3d at 611 (plaintiff brought suit against his "former employers"). The individual Plaintiffs here, however, were not County employees and the budget approved by the County did not take adverse action directly against them. And while it is true that the County's budget decreased the LFRDs' funding, the decision to address that shortfall by terminating the individual Plaintiffs was made by the LFRDs.

Relying on *Umbehr*, however, Plaintiffs argue that this distinction is of no moment. We disagree. In *Umbehr*, the county

fulfilled its obligation to dispose of solid waste by contracting with Umbehr to provide the service. The contract, although subject to termination by either party, automatically renewed each year. After years of operating under this contractual arrangement, and allegedly in retaliation for Umbehr's criticism of the board of county commissioners, the board terminated the contract. Umbehr filed a retaliatory discharge action under 42 U.S.C. § 1983. The district court granted the county's motion for summary judgment, finding that Umbehr—as an independent contractor—was not entitled to the First Amendment protection guaranteed government employees. The Tenth Circuit reversed, finding that an independent contractor was protected under the First Amendment from retaliatory government action. The Supreme Court affirmed.

*Umbehr*, however, does not control this case. In the first place, *Umbehr* considered a challenge to the termination of a specific government contract, not a generally applicable budgetary enactment. But more importantly, the premise in *Umbehr*—that a county terminated an independent contractor in retaliation for his criticism of county officials—is not one that plausibly flows from the allegations in Plaintiffs' complaint. Simply put, Defendants did not terminate the individual Plaintiffs' employment. Indeed, under the Code, Defendants lacked such authority. *See* J.A. 554 ("Nothing in this Chapter abrogates the authority of *each local fire and rescue department* over such functions as hiring, promotion, discipline, and *discharge* of employees of that department." (quoting Code § 21-16(c) (emphasis added)). Because the individual Plaintiffs were not County employees or contractors and Defendants did not terminate their employment, *Umbehr* is inapposite.

In this case, Plaintiffs seek to invalidate an "otherwise constitutional" budgetary enactment based on the alleged illicit motives of Defendants, *O'Brien*, 391 U.S. at 383. This, the district court properly declined to do. We therefore affirm the

district court's dismissal of Plaintiffs' First Amendment, Article 40, and § 1983 claims.

## IV.

Plaintiffs also challenge the district court's ruling that County Executive Leggett and Fire Chief Bowers are shielded by legislative immunity. Conceding that this immunity "covers all those properly acting in a legislative capacity, not just actual officeholders," *EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011), Plaintiffs argue that because Leggett and Bowers were performing executive or administrative functions, they are not so entitled. We disagree.

"Local legislators are entitled to absolute immunity from § 1983 liability for their legislative activities." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998). This immunity extends to "officials outside the legislative branch . . . when they perform legislative functions" and attaches to "all actions taken in the sphere of legitimate legislative activity." *Id.* at 54-55 (internal quotations omitted). Determining "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Id.* at 54. We explained the inquiry in *Washington Suburban Sanitary Commission*:

> Legislative acts, the ones for which the immunity and privilege are granted, typically involve the adoption of prospective, legislative-type rules, rules that establish a general policy affecting the larger population. They also generally bear the outward marks of public decisionmaking, including the observance of formal legislative procedures. By contrast, legislators' employment and personnel decisions are generally administrative acts because they most often affect specific individuals rather than formulate broad public policy.

631 F.3d at 184 (internal quotations, citations, and alteration omitted).

Applying this test, we have no trouble concluding that enacting a budget is a legislative act. *E.g.*, *Bogan*, 523 U.S. at 55 (determining that the "introduction of a budget and signing into law an ordinance . . . were formally legislative" even where accomplished by an executive official); *Berkley*, 63 F.3d at 302 (finding that, in challenging the city's annual budget, plaintiffs "challenged the [city's] execution of a core legislative function"); *Rateree v. Rockett*, 852 F.2d 946, 950 (7th Cir. 1988) ("[B]udgetmaking is a quintessential legislative function, reflecting the legislators' ordering of policy priorities in the face of limited financial resources." (internal quotations omitted)).

We also find that Leggett and Bowers, while not legislators, have been sued based on their actions associated with the budgetmaking process. Leggett faces trial for his actions in proposing and submitting the budget to the County Council, a task required of him by local law. *See* J.A. 564 (noting that the Fire Chief must submit the proposed budget to the County Executive "for review and submission to the County Council as required by the County Charter") (quoting Code § 21-22(c)). Thus, Leggett's actions were within "the sphere of legitimate legislative activity," *Bogan*, 523 U.S. at 54 (internal quotations omitted), and he is entitled to immunity. And Bowers is faulted for his allegedly misleading testimony to the County Council prior to the vote on the budget. "[S]peaking before a legislative body" is, however, a type of legislative activity to which absolute immunity applies. *Baraka v. McGreevey*, 481 F.3d 187, 196 (3d Cir. 2007) (finding that "when a governor and a governor's appointee advocate bills to the legislature, they act in a legislative capacity"). Thus, Bowers is also entitled to legislative immunity.

In arguing otherwise, Plaintiffs contend that it was through their exercise of executive and administrative duties, respec-

tively, that Leggett and Bowers participated in the budget process. In *Rateree*, plaintiffs similarly argued that a budget that eliminated jobs was "necessarily administrative since it involved employment decisions." 852 F.2d at 950. The Seventh Circuit, however, rejected this "backdoor approach," noting that it "would turn every budget decision into an administrative one." *Id.*

Leggett and Bowers were tasked with executive and administrative duties, but they are named as defendants based on their legislative activity in proposing, submitting, and advocating for a budget. *See Wash. Suburban Sanitary Comm'n*, 631 F.3d at 184 (explaining that "[l]egislative acts . . . typically involve the adoption of prospective, legislative-type rules, rules that establish a general policy affecting the larger population" (internal quotations, citation, and alterations omitted)). Legislative immunity includes "officials outside the legislative branch . . . when they perform legislative functions." *Bogan*, 523 U.S. at 55. Thus, the district court properly found that Leggett and Bowers are entitled to legislative immunity.

## V.

Plaintiffs also argue that the district court erred in concluding that because the individual Plaintiffs were employees of the LFRDs rather than the County, they are barred from bringing an abusive discharge claim under Maryland law. Maryland "recognize[s] a cause of action for abusive discharge by an *employer* of an at will *employee* when the motivation for the discharge contravenes some clear mandate of public policy." *Adler v. Am. Standard Corp.*, 432 A.2d 464, 473 (Md. 1981) (emphasis added).

Plaintiffs contend that dismissal under Rule 12(b)(6) was improper, as there exists a genuine issue of material fact as to whether the individual Plaintiffs were dual employees of the County and the LFRDs. In support, they assert that the indi-

vidual Plaintiffs (1) were paid by the County; (2) received County benefits; (3) held County job classifications; (4) were assigned County email addresses; and (5) were managed by the MCFRS division chief.

These facts, however, do not overcome the express language in the Code providing that "[e]mployees of local fire and rescue departments who are paid with tax funds are not County employees." J.A. 553 (quoting Code § 21-16(a)). And, after outlining the personnel services that the County provides to Plaintiffs, the Code reiterates this principle:

> Nothing in this Chapter means that employees of the local fire and rescue departments are County employees, either on a de jure or de facto basis. Nothing in this Chapter abrogates the authority of each local fire and rescue department over such functions as hiring, promotion, discipline, and discharge of employees of that department.

*Id.* 554 (quoting Code § 21-16(c)). Under the plain and express language of the Code, the individual Plaintiffs are not County employees.

Nor do we accept the broad definition of "employer" that Plaintiffs propose. In suggesting a dual employment relationship, Plaintiffs rely on *Newell v. Runnels*, 967 A.2d 729, 771 (Md. 2009), where the Court of Appeals of Maryland determined that under the federal Fair Labor Standards Act ("FLSA"), "an employee may have more than one employer at a given time." The court emphasized that "[t]he statutory definition of an 'employer' [in the FLSA] is broad, encompassing entities that act 'directly or indirectly in the interest' of an employer with respect to an employee" and that courts had held that "[t]he term 'is not limited by the common law concept of employer, and is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes." *Id.* (internal quotations omitted). As the district court

noted, however, Plaintiffs did not bring a FLSA claim, and they have not cited a case that suggests that an abusive discharge claim under Maryland law supports a similarly expansive reading of "employer." Thus, we reject Plaintiffs' dual employment argument.

Finally, we again emphasize that while the County reduced the LFRDs' budget, it was the LFRDs that actually eliminated the administrative positions and terminated the individual Plaintiffs. Accordingly, we affirm the district court's judgment that Plaintiffs are barred from suing Defendants for abusive discharge under Maryland law.[4]

## VI.

For the reasons stated, the judgment of the district court is

*AFFIRMED*.

---

[4]Plaintiffs' opening brief does not challenge the district court's dismissal of their claims seeking declaratory, injunctive, and mandamus relief. Accordingly, we consider these issues waived. *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 308 (4th Cir. 2003) ("Failure to present or argue assignments of error in opening appellate briefs constitutes a waiver of those issues.").